Erik A. Christiansen, USB #7372
Christina M. Jepson, USB #7301
Sarah Jenkins Dewey, USB #15640
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
EChristiansen@parsonsbehle.com
CJepson@parsonsbehle.com
SDewey@parsonsbehle.com
ecf@parsonsbehle.com

Gregg M. Formella (pro hac vice)
**GREGG M. FORMELLA JD**
300 State St.
P.O. Box 92141
Southlake, TX 76092
gregg.formella@gmail.com

*Attorneys for SkyWest InFlight Association*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO; SHANE PRICE; TRESA GRANGE; and BRANDON FINLEY, <br><br> Plaintiffs, <br><br> v. <br><br> SKYWEST AIRLINES INC.; SKYWEST INFLIGHT ASSOCIATION, <br><br> Defendants. | **SIA'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTERCLAIMS** <br><br> Case No. 2:23-cv-723-DBB-DBP <br><br> The Honorable David Barlow <br><br> Chief Magistrate Judge Dustin B. Pead |

4932-6850-3661.v6

SKYWEST INFLIGHT ASSOCIATION,

     Counterclaimant,

v.

ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO; SHANE PRICE; TRESA GRANGE; JACQUE CROSSLEY; and GAILEN DAVID,

     Counterclaim Defendants.

## INTRODUCTION

This lawsuit stems from the ongoing but so-far unsuccessful efforts of Plaintiff/Counterclaim Defendant Association of Flight Attendants-CWA, AFL-CIO ("AFA") and some of its supporters to displace and replace SkyWest InFlight Association ("SIA") as the recognized bargaining agent for SkyWest's roughly 4,600 Flight Attendants. It appears AFA and some of its supporters initiated this lawsuit in an effort to drum up support for AFA's lagging campaign. Through discovery in this case, SIA learned that AFA's efforts crossed the line from legitimate organizing efforts to simply breaking the law.

Documents produced by Plaintiffs in this case reveal that AFA and its "Mobilization Coordinator," Counterclaim Defendant Gailen David, were directly involved with the illegal acts of certain AFA supporters, Plaintiffs/Counterclaim Defendants Shane Price and Tresa Grange and Counterclaim Defendant Jacque Crossley. As detailed in SIA's Amended Counterclaims ("Counterclaim" or "AC"), AFA, David, Price, Grange, and Crossley (collectively "Counterclaim Defendants") unlawfully obtained SIA's confidential information, including information about its members and their individualized voting credentials for the August 2023 election, as part of their

2

effort to compromise that election and as part of their broader efforts to unseat and replace SIA. To defend its and its other 4,000-plus members' rights, SIA asserted counterclaims against AFA, David, Price, Grange, and Crossley.

In an apparent attempt to shift focus from their now-well-documented unlawful acts, Counterclaim Defendants' Motion to Dismiss Certain Counterclaims and Memorandum in Support (the "Motion"), ECF No. 129, spends considerable time reciting unproven (and false) allegations against SIA and SkyWest. Those allegations are not relevant here. Examining what actually matters to the resolution of this Motion—the law and the allegations in SIA's Counterclaim—shows that SIA's Counterclaim easily clears Rule 12(b)(6)'s minimal bar. The Court should deny Counterclaim Defendants' Motion.

## BACKGROUND

### A.    Factual background

SIA is and has been for many years the recognized collective bargaining agent for SkyWest's roughly 4,600 Flight Attendants. AC ¶¶ 1–2, ECF No. 110. AFA has been trying to replace SIA in that role since at least 2022. *Id.* ¶ 15. Gailen David is a "Mobilization Coordinator" working for AFA to try to replace SIA. *Id.* ¶ 10. The other Counterclaim Defendants, Shane Price, Tresa Grange, and Jacque Crossley, are or were Flight Attendants and SIA members who support AFA's goal to replace SIA. *Id.* ¶¶ 4, 6, 7, 9.

That goal presents no easy task. For AFA to be certified as the Flight Attendants' national labor representative, AFA must complete a multi-step process. *Id.* ¶¶ 15, 17–18. The first step requires AFA to convince at least fifty percent of SkyWest Flight Attendants to sign authorization cards supporting AFA. *Id.* ¶ 17. AFA has been stuck at this first step for years. *Id.* ¶ 19. However,

3

4932-6850-3661.v6

AFA has strong motivation to do whatever it takes to succeed. If it succeeds in taking over for SIA, AFA could require SkyWest's Flight Attendants to pay union fees and dues totaling over $3 million annually. *Id.* ¶ 16.

AFA and its supporters have sought to "discredit" SIA to drum up interest in AFA. To this end, on early 2023, Price learned that by accessing SIA's password-protected website and manipulating its URL, he could access confidential information belonging to SIA including the names and employee identification numbers of every SkyWest Flight Attendant. *Id.* ¶ 21. This information also included voting credentials (login and password) for every Flight Attendant that SIA obtained from Vote-Now, the third-party vendor SIA was using to administer its August 2023 election. *Id.* ¶¶ 21, 31–32. This information was not accessible to the public, and Price was not authorized to access it. *Id.* ¶ 21. Rather than alert SIA to this vulnerability, Price instead told Crossley and David about his ability to access this information. *Id.* ¶ 23. Price sent them an email with links to files, folders, and documents containing SIA's information, including .csv files, PDFs, and the root file:



*Id.* ¶ 24. Crossley facilitated communication between AFA/David and Price. *Id.* ¶ 25. David was apparently concerned that AFA accessing this information might be "sketchy," so he checked with AFA about what to do. *Id.* After checking with AFA, David asked Price to "quietly download this information every month," which Price agreed he could "definitely" do. *Id.* ¶¶ 26–27. David then forwarded Price's email with links to SIA's information to others at AFA. *Id.* ¶ 28.

As the August 2023 election approached, a group of AFA supporters including Price, Grange, and Crossley exchanged messages about the access to SIA's information that Price had obtained and discussing how they "should use this information[.]" *See, e.g.*, *id.* ¶¶ 35–68. This included messages on a WhatsApp group for AFA supporters. *See id.* ¶ 44–68. On this WhatsApp group, Price, Grange, Crossley, and other AFA supporters hatched a plan to blow up SIA's election and thereby drum up interest in AFA. *Id.* David from AFA was included on these messages and was asked for his advice. *Id.* ¶¶ 56–57, 65. David did not advise the other Counterclaim Defendants to stop what they were planning or ask to be removed from these messages; instead, he opted to say nothing and allow their plan—which would help his and AFA's campaign—to unfold. *Id.* ¶ 57.

On or around August 14, 2023, Price created a video and Grange, on behalf of herself, Price, Crossley, and AFA, posted the video showing how to access SIA's information without authorization and how someone could use that information to cast fraudulent votes. *Id.* ¶¶ 69–72. Around the same time, SIA's voting administrator discovered suspicious voting patterns, prompting SIA to arrange a forensic investigation. *Id.* ¶¶ 74, 76. Through this investigation, SIA learned that Price (and another now-former Flight Attendant) had fraudulently used other Flight Attendants' login credentials to access and/or cast ballots in the SIA election. *Id.* ¶ 77. SIA's election was thereby compromised. *Id.* ¶ 75. The administrator, Vote-Now, could not certify the

4932-6850-3661.v6

election. *Id.*. Because SIA's confidential information (e.g., the voting credentials) had been published, SIA had to hold a new election and arrange for new voting credentials for each of SIA's more than 4,100 members. *Id.* ¶ 82. SkyWest subsequently terminated the employment of Grange and Price because of their conduct. *Id.* ¶ 79.

AFA quickly moved to exploit SIA's compromised election to further its goal of replacing SIA. *Id.* ¶ 80. Shortly after SIA's August 2023 election was compromised, AFA's National President, Sara Nelson, misrepresented the actions of Price and Grange, testifying before the U.S. Senate Committee on Health, Education, Labor, and Pensions that:

> We have an organizing campaign at the largest regional carrier right now, SkyWest Airlines. . . . When Tresa Grange, a nearly 25-year employee with SkyWest and honored, and Shane Price, nine-year employee, stood up and showed that this company union was a sham and that their voting system was a sham, they were fired for their union organizing.

*Id.* Nelson did not, however, explain that Price and Grange were actually terminated for wrongfully accessing and publishing confidential information about SkyWest's Flight Attendants, nor did she explain that AFA had asked Price to "quietly download" that very same information. *Id.* ¶ 81.

### B.     Procedural history

SIA's counterclaims allege violations of the Computer Fraud and Abuse Act ("CFAA") (all Counterclaim Defendants); the Stored Communications Act ("SCA") (Price and Grange); the Utah Computer Abuse and Data Recovery Act ("CADRA") (Price and Grange); as well as claims for breach of contract (Grange); conversion (AFA, David, and Price); trespass to chattels (AFA, David, and Price); civil conspiracy (all Counterclaim Defendants); and tortious interference with contractual relationships (all Counterclaim Defendants). Counterclaim Defendants' Motion does

not challenge SIA's CFAA claim against Price and Grange, nor does it challenge SIA's CADRA and breach-of-contract claims. *See* ECF No. 129 at 1 n.1.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a counterclaim "does not need detailed factual allegations." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). It only need allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In conducting this analysis, the Court "must accept the truth of all properly alleged facts and draw all reasonable inferences in" the non-movant's favor. *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025) (citation omitted). "[T]he court does not consider the complaint or answer . . . in a motion to dismiss counterclaims." *Evox Prods., LLC v. Yahoo Inc.*, No. CV202852CBMJEMX, 2024 WL 629472, at *2 (C.D. Cal. Jan. 18, 2024) (quotation marks and citation omitted).

The Tenth Circuit has "emphasized" that "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Brown*, 124 F.4th at 1264 (quotation marks and citation omitted). Consequently, the Tenth Circuit "impose[s] a 'low bar for surviving a motion to dismiss[.]'" *Id.* (citation omitted). SIA's Counterclaim easily clears this threshold.

## ARGUMENT

I.    **THE COUNTERCLAIM ADEQUATELY PLEADS AFA, DAVID, AND CROSSLEY MAY BE HELD LIABLE UNDER THE CFAA**

SIA's CFAA counterclaim alleges that Price, with support and encouragement from the other Counterclaim Defendants, and without authorization or right to do so, logged into SIA's password-protected website and used hacking techniques to access the confidential partition containing each Flight Attendants' confidential information, which Price then used to log into

4932-6850-3661.v6

Vote-Now's secure voting system and access other Flight Attendants' ballots, rendering SIA's August 2023 election invalid.[1] AC ¶ 85–88. The Counterclaim also alleges the Counterclaim Defendants conspired to this end. *See, e.g.*, *id.* ¶¶ 85, 120–23. Counterclaim Defendants do not challenge this counterclaim against Price and Grange. They challenge it only as alleged against AFA, David, and Crossley, arguing that this claim should fail against them because, according to them, the Counterclaim does not allege they personally "accessed" SIA's confidential information. Mot. at 5–9. This is unpersuasive.

The CFAA's plain language "requires only 'access'—no modifying term suggesting the need for 'personal access' is included." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014) (citation and some internal quotation marks omitted), *aff'd,* 958 F.3d 168 (3d Cir. 2020). Courts have therefore found that inducing another to access a computer they otherwise would not have been authorized to use constitutes "access" within the CFAA's coverage. *Id.* (citations omitted). Liability is not limited to situations where an employer directs their employee to access a computer. *See Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 500 & n.3 (D. Del. 2022).

Here, the Counterclaim alleges that David (AFA's employee and agent) and Crossley learned about Price's ability to wrongfully access SIA's information, which Price sent to David and Crossley; that David then "check[ed]" with AFA about whether he could "give this access to AFA IT or if it would be considered sketchy," with Crossley helping to facilitate between David and Price and herself encouraging Price that, for example, "[w]e just need to expose them"; that

---

[1] The brief descriptions of SIA's counterclaims are provided for reference only and are in no way intended to limit SIA's allegations or theories of its counterclaims.

4932-6850-3661.v6

David then asked Price to "quietly download" the information "every month," which Price agreed he could "definitely" do; and then David forwarded this information to others at AFA. *See, e.g.*, AC ¶¶ 23–28, 39. By alleging that AFA, David, and Crossley induced Price to access and send SIA's information, the Counterclaim sufficiently alleges wrongful "access" under the CFAA. *See Advanced*, 28 F. Supp. 3d at 327 (citations omitted). Counterclaim Defendants' arguments about vicarious and secondary liability are therefore beside the point. They are in any case unconvincing.

Counterclaim Defendants have not established that the CFAA does not permit vicarious or secondary liability. They rely primarily on the Tenth Circuit's decision in *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245 (10th Cir. 2012). *Kirch* examined whether a different statute, the Electronic Communications Privacy Act of 1986 ("ECPA"), provides for aiding-and-abetting liability, finding it does not. *See id.* at 1246–47. In reaching this conclusion, the Tenth Circuit found the ECPA's statutory history to be "illuminating." *Id.* at 1247. Specifically, the Tenth Circuit highlighted that the ECPA's civil liability provision, which originally provided civil liability "against any person who intercepts, discloses, or uses, or *procures* any other person to intercept, disclose, or use such communications," was modified to delete the "procures" language when it was adopted in 1986. *Id.* at 1247 (citation omitted). Counterclaim Defendants have not identified a similarly clarifying legislative history in the CFAA.

Also absent from Counterclaim Defendants' Motion is any convincing argument addressing § 1030(b), which makes it unlawful to conspire to commit an offense under the CFAA. *See* 18 U.S.C. § 1030(b). At least one court in the Tenth Circuit has likened CFAA conspiracy liability to vicarious liability. *See Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F. Supp. 3d 961, 985 (D. Colo. 2016) (citations omitted). Perhaps unsurprisingly then, "[n]umerous courts have

9

4932-6850-3661.v6

recognized that vicarious or indirect liability under section 1030(g) extends to parties who direct, encourage, or induce others to commit acts that violate the statute." *Ryanair*, 636 F. Supp. 3d at 499 (citing cases). Counterclaim Defendants may also be held liable under this theory.

The Counterclaim alleges David (AFA's employee and agent) and Crossley directed, encouraged, or induced Price to obtain SIA's information in violation of the CFAA. *See, e.g.*, AC ¶¶ 23–28, 86. The Counterclaim also alleges that AFA had knowledge of, and apparently directed, David's conduct (and Price's conduct going forward) in accessing and obtaining SIA's information. *See* AC ¶¶ 25–28 (alleging David "checked" with AFA about distributing Price's information, which David flagged as potentially "sketchy," after which David then shared that information with others at AFA and asked Price to "quietly download" the information every month going forward). This further supports liability for AFA. *See Ryanair*, 636 F. Supp. 3d at 500–02 (citations omitted); *see also id.* at 401 n.5 (citation omitted). AFA, David, and Crossley are also liable under another theory: conspiracy.

Section 1030(b) of the CFAA extends liability to anyone who "conspires to commit" a violation of the CFAA. 18 U.S.C. § 1030(b). "Courts have routinely entertained claims under section 1030(b) in civil cases." *Ryanair*, 636 F. Supp. 3d at 510 & n.12 (citations omitted); *see also Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, No. 3:09-CV-00422-PMP, 2011 WL 2847712, at *3 (D. Nev. July 15, 2011) (noting the CFAA's plain language establishes liability for "a co-conspirator of a primary violator").[2]

---

[2] Counterclaim Defendants' argument that SIA cannot maintain claims against AFA, David, or Crossley because the CFAA provides for civil liability only against "the violator" is especially unpersuasive as to SIA's theory of conspiracy liability. This argument "fails to recognize . . . that a defendant who conspires to commit a CFAA violation is itself a violator of section 1030(b),

4932-6850-3661.v6

To plead CFAA conspiracy, some courts have required "specific allegations of an agreement and common activities." *Ryanair*, 636 F. Supp. 3d at 510 (citation and quotation marks omitted). Other courts have required allegations satisfying the general federal conspiracy statute, 18 U.S.C. § 371. *See Satcom Sol. & Res. LLC v. Pope*, No. 19-CV-02104-CMA-GPG, 2020 WL 4511773, at *11 (D. Colo. Apr. 20, 2020) (citation omitted), *report and recommendation adopted,* No. 19-CV-02104-CMA-NRN, 2020 WL 2188922 (D. Colo. May 6, 2020). This requires (1) "the defendant agreed with at least one other person to violate the law," (2) "one of the conspirators engaged in at least one overt act furthering the conspiracy's objective," (3) "the defendant knew the essential objective of the conspiracy," (4) "the defendant knowingly and voluntarily participated in the conspiracy," and (5) "there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged." Tenth Circuit Criminal Pattern Jury Instructions § 2.19 (Feb. 7, 2025). SIA's Counterclaim satisfies either standard.

SIA's Counterclaim alleges AFA, David, and Crossley—together with Grange and Price—conspired to violate the CFAA. *See, e.g.*, AC ¶¶ 85–88, 121. As set out above, the Counterclaim alleges that David (AFA's employee and agent[3]) and Crossley learned of Price's ability to wrongfully access SIA's information. *Id.* ¶ 23. David then checked with AFA about if and how to use this access. *Id.* ¶ 25. Crossley participated in these communications and helped facilitate

---

which falls within the scope of the cause of action provided in section 1030(g)." *See Ryanair*, 636 F. Supp. 3d at 510 n.12.

[3] In addition to approving and apparently directing David's and Price's acts, AFA is also liable for David's acts as its employee and agent. *See Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*, No. 2:20-CV-352-JNP-DAO, 2021 WL 5772269, at *6 (D. Utah Dec. 6, 2021) ("[A]cts of corporate agents are acts of the corporation itself[.]" (citations omitted)).

11

between David and Price. *Id.* ¶¶ 24–26. David, having checked with AFA (and thus apparently acting at its direction), asked Price to "quietly download" SIA's information "every month," to which Price readily agreed. *Id.* ¶¶ 26–27. AFA, David, and Crossley (and, of course, Price), knew that this access was unlawful, as demonstrated by David's earlier concern that accessing SIA's information this way was "sketchy," his request for Price to do so "quietly," and Price blurring out his name from the video he made. *Id.* ¶¶ 25–26, 67–68. Using the wrongfully obtained information, Price logged into Vote-Now's secure voting system and accessed other Flight Attendants' ballots, thereby invalidating the election. *Id.* ¶ 87. The co-conspirators intended to act for their shared mutual benefit in that they all want AFA to replace SIA and sought to use the information obtained to that end by discrediting SIA. *Id.* ¶¶ 3–4, 80. Notably, Counterclaim Defendants' Motion does not dispute that the Counterclaim plausibly alleges Price's underlying violations of the CFAA.[4] *See Ryanair*, 636 F. Supp. 3d at 510 ("Because Ryanair has alleged an underlying violation of the CFAA along with an agreement and common activities with third parties, the defendants' motion to dismiss . . . must be denied[.]"). The Counterclaim alleges AFA, David, and Crossley are liable under the CFAA.

## II.    THE COUNTERCLAIM ADEQUATELY PLEADS A CLAIM UNDER THE SCA

SIA's SCA counterclaim alleges Price (with Grange's support and encouragement) hacked into a protected portion of SIA's website to abscond with SIA's confidential information so he could provide that information to AFA and disrupt SIA's election by using other Flight Attendant's voting credentials to fraudulently access Vote-Now's voting platform. AC ¶¶ 94–99. Grange also wrongfully accessed this information. *See id.* ¶¶ 35–36, 38. These actions harmed SIA and its

---

[4] Nor does it dispute that the Counterclaim states a plausible CFAA claim against Grange.

members by, for example, compromising their confidential information and requiring a re-do of SIA's August 2023 election. *Id.* ¶¶ 92–93. Counterclaim Defendants argue that SIA's SCA counterclaim does not adequately plead that SIA's website qualifies as a "facility" or that the information accessed qualifies as an "electronic communication" under the SCA. Mot. at 10–13. These arguments are not persuasive.

Part of the SCA's purpose is to protect "personal and proprietary information." *See Expert Janitorial, LLC v. Williams*, No. 3:09-CV-283, 2010 WL 908740, at *4 (E.D. Tenn. Mar. 12, 2010) (citation omitted). Section 2701 of the SCA thus makes it unlawful to "intentionally access[] without authorization a facility through which an electronic communication service is provided" or "intentionally exceed[] an authorization to access that facility . . . and thereby obtain[], alter[], or prevent[] authorized access to a wire or electronic communication while it is in electronic storage[.]" 18 U.S.C. § 2701(a). A civil action may be brought by "any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter . . . ." 18 U.S.C. § 2707(a).

The SCA does not define "facility." *See* 18 U.S.C. § 2510. It does, however, define "electronic communication" and "electronic storage." 18 U.S.C. § 2510(12), (17). With a few irrelevant exceptions, "electronic communication" means "*any* transfer of signs, signals, writing, images, sounds, data, or intelligence *of any nature* transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce[.]" *Id.* § 2510(12) (emphasis added). "[E]lectronic storage" means "*any* temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "*any* storage of such communication by an electronic communication

13

4932-6850-3661.v6

service for purposes of backup protection of such communication[.]" *Id.* § 2510(17) (emphasis added). These broad definitions shed some light on the meaning of "facility."

In addition, courts have interpreted the SCA "to apply to providers of a communication service such as telephone companies, Internet or e-mail service providers, and bulletin board services." *Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 792 (5th Cir. 2012). As *Garcia* notes, the SCA's legislative history focused on "facilities operated by electronic communications services such as 'electronic bulletin boards' and 'computer mail facilit[ies],' and the risk that communications temporarily stored in these facilities could be accessed by hackers." *Id.* (citation omitted).

The Counterclaim adequately pleads wrongful access to a "facility." *Garcia* notes that the "facilities" about which the SCA is concerned "are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." *Id.* (quotation marks and citation omitted). Things like end users' home computers—or in Garcia's case, her personal cell phone—are therefore not typically found to qualify as "facilities." *See id.* (citations omitted); *see also Satcom Sol. & Res. LLC v. Pope*, 2020 WL 4511773, at *6–7 (citing *Garcia* and finding SCA did not cover plaintiff's "business computer network"). This is not the situation here. Here, SIA transmitted information to its members—including their individualized voting credentials—via a protected portion of SIA's website from which members would access and retrieve their voting credentials. *See* AC ¶¶ 4, 21, 31–32. SIA members would then login to the Vote-Now website to cast their vote. *Id.* ¶31. The situation here is thus more akin to email and electronic bulletin boards—and the concern about hackers accessing their contents—than it is to

14

an end users' cell phones or computers, at least with respect to its members' voting credentials. Counterclaim Defendants' argument is thus unpersuasive.

The Counterclaim also adequately pleads that SIA's confidential member information qualifies as an "electronic communication." That term is "broadly defined." *Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019). It encompasses things like email, *see id.* at 784–85 (citations omitted), and non-public bulletin board posts like those made on a private Facebook wall, *see Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 66–67 (D.N.J. 2013). SIA's website, which was functioning similar to email or a private electronic bulletin board, fits comfortably within the SCA's "broad" definition of "electronic communication." *See Hately*, 917 F.3d at 785 ("'Given that the statute defines an electronic communication to be any 'transfer of signals' of 'any nature' by means of virtually any type of transmission system (*e.g.*, wire, electromagnetic, etc.), there can be no doubt it is broad enough to encompass e-mail communications and other similar signals transmitted over the Internet.'" (citation omitted)).

## III.    THE COUNTERCLAIM ADEQUATELY PLEADS CONVERSION

This counterclaim alleges that Price, with AFA and David's encouragement and acting on their request, unlawfully downloaded—that is, stole—SIA's confidential information, which included voting credentials for the Flight Attendants to use in the August 2023 election, among other things. AC ¶¶ 108–112. As a result, SIA was forced to change its website, logins, and identifying information; for example, each Flight Attendant's voting credentials became worthless and unusable once Price accessed them, requiring SIA to obtain new credentials for its members and re-run its August 2023 election. *Id.* ¶ 113. Counterclaim Defendants challenge SIA's conversion claim on three grounds. None is persuasive.

15

4932-6850-3661.v6

A.    **Counterclaim Defendants have not shown Utah limits conversion to tangible things, and in any case, the information Counterclaim Defendants stole exists as electronic files and is thus tangible**

Counterclaim Defendants first argue this claim should fail because intangible property cannot form the basis for such a claim. Mot. at 14–15. This is unpersuasive. The only Utah appellate case they cite, *Kirkham v. Widdison*, involved a dispute over which divorced parent got to claim the child tax exemption. 447 P.3d 89, 93, 97 (Utah Ct. App. 2019). Although a footnote in that opinion states the information underlying the returns was the subject of the claim, *id.* at 91 n.11, the case's discussion reflects that the real issue there was tax status—an intangible concept—or, at least, that the information was inextricably intertwined with that concept. *See, e.g.*, *id.* at 97 ("The trial court concluded that Kirkham's conversion claim failed because 'Kirkham's tax status is not property that can be converted'"). Moreover, the Utah Court of Appeals did not base its decision solely on that reasoning; it found the claim failed for multiple other reasons. *Id.* at 97–98. Another of Counterclaim Defendants' cases, *Mitchell v. Wells Fargo Bank*, involved a similarly conceptual subject. 355 F. Supp. 3d 1136 (D. Utah 2018). There, the plaintiffs complained that Wells Fargo used their personal information to open fraudulent accounts in their names. *Id.* at 1144. The plaintiffs described their failed claim as being for "[c]onversion of identity." *Id.* at 1160. SIA's conversion claim is not grounded on intangible things like tax status or identity.

SIA's confidential information is not intangible and can therefore form the basis for a claim of conversion. It exists as electronic files. *See, e.g.*, AC ¶ 24 (depicting Price emailing David and Crossley links to documents, files, folders, .csv files, and PDFs containing SIA's information).[5]

---

[5] This is in stark contrast to, for example, *Z's IT Consulting Servs., Inc. v. Hunt L. Grp., LLC*, a non-binding Illinois case which, after recognizing that some states do not limit conversion to tangible personal property, found the particular claim inadequate because the pleading did "not

16

"In the modern world, computer files hold the same place as physical documents have in the past. If paper documents can be converted, as they no doubt can, . . . no reason appears that computer files cannot." *Network Sys. Architects Corp. v. Dimitruk*, No. CIV.A. 06-4717-BLS2, 2007 WL 4442349, at *10 (Mass. Super. Dec. 6, 2007) (citations omitted); *see also E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.,* 688 F. Supp. 2d 443, 454–55 (E.D. Va. 2009) (treating electronic copy of information the same as a paper copy for the purposes of conversion). The Utah Supreme Court would likely agree. As it explained when discussing software in another tangibility context:

> Although perhaps difficult to comprehend and perceive at these microscopic levels, the electronic signals of installed software are tangible. Software is information recorded in a physical form which has a physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses.

*S. Cent. Utah Tel. Ass'n, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 951 P.2d 218, 223–24 (Utah 1997) (citations omitted). Counterclaim Defendants' tangibility argument is thus ineffective. Their other arguments are no more convincing.

### B.      The Counterclaim adequately alleges interference

Again relying on *Mitchell*, Counterclaim Defendants next argue SIA has not alleged interference sufficient to support conversion because SIA retained access to the information at all times. Mot. at 14–15. This does not defeat SIA's claim. In *Mitchell*, the plaintiffs complained their identities had been used to create fraudulent accounts but did not allege "they were deprived of the use of their names, address, etc." *Mitchell*, 355 F. Supp. 3d at 1160. Despite the fraudulent accounts

---

identify in what form [defendant] converted" the passwords and access codes. 256 N.E.3d 479, 483–485, *appeal allowed,* 256 N.E.3d 992 (Ill. 2025).

4932-6850-3661.v6

being opened, those plaintiffs were still able to use their identities. The facts here are nothing like *Mitchell*.

They are, however, on par with *UHS of Provo Canyon, Inc. v. Bliss*, No. 2:24-CV-163-DAK-CMR, 2024 WL 4279243, (D. Utah Sept. 24, 2024). There, the defendant took training materials belonging to the plaintiff, a psychiatric youth residential treatment center. *Id.* at *1, 14–15. The defendant sought dismissal of the conversion claim on essentially the same grounds Counterclaim Defendants raise here, arguing that because he only had a copy, the plaintiff was not sufficiently deprived of its property. *Id.* at *15. This court rejected that argument, finding that because the facility alleged that the taking of its training materials compromised its safety precautions, it raised the possibility it had "been deprived of the training manual's use because it would need to create new safety protocols and new manuals because the prior protocols and manuals are compromised." *Id.*

Unlike *Mitchell*, but just like *Provo Canyon*, the Counterclaim alleges that Counterclaim Defendants' taking of SIA's information "deprive[ed] SIA from using the information, requiring SIA to change its website, logins, and identifying information." AC ¶ 111; *see also id.* ¶ 82 ("Due to Price and Grange publishing the Confidential Member Information from SIA's website and the fraudulent votes believed to be cast by Robertson, SIA needed to hold a new election, which included arranging for new voting credentials for each one of its then more than 4,100 Flight Attendants."); *id.* ¶ 119. The Counterclaim thus adequately pleads interference.

### C.   The Counterclaim adequately alleges damages

Counterclaim Defendants lastly argue this claim should fail for lack of any alleged damages. Mot. at 15–16. Not so. The Counterclaim alleges that the information Counterclaim

18

4932-6850-3661.v6

Defendants took had value. It alleges, for example, that "SIA utilized"—that is, paid—"a third-party vendor Vote-Now . . . to administer the August 2023 Election virtually," and that Vote-Now provided SIA with individualized and unique credentials for the members to cast their ballots. AC ¶¶ 31–32. The Counterclaim also alleges that because of Counterclaim Defendants' interference with SIA's information, SIA had to change its website, logins, and identifying information which had, of course, been rendered valueless owing to the Counterclaim Defendants' publication of the information, *id.* ¶ 111, as well as pay for a forensic expert to help figure out what happened, *id.* ¶ 76. SIA also had to re-run the election, since the results could not be certified. *Id.* ¶ 75; *see also id.* ¶ 119. These things all come with a cost, and those costs are recoverable damages. *See* Restatement (Second) of Torts § 927 & cmt. *m* (Am. Law Inst. 1979) (noting damages for conversion may include the value of the subject matter and "the amount of any further pecuniary loss of which the deprivation has been a legal cause"); *see also Henderson v. For-Shor Co.*, 757 P.2d 465, 469–70 (Utah Ct. App. 1988).

## IV.    THE COUNTERCLAIM ADEQUATELY PLEADS TRESPASS TO CHATTELS

This counterclaim alleges Price, with AFA and David's encouragement and acting on their request, interfered with SIA's confidential information and website by accessing protected portions of SIA's website without authorization and downloading information from SIA's website. AC ¶¶ 25–27, 114–18. This damaged SIA by requiring SIA to hire an outside expert to investigate the election, requiring SIA to re-run its election, and requiring SIA to divert resources, among other things. *Id.* ¶ 119.

### A.    Trespass to chattels is recognized and defined under Utah law

4932-6850-3661.v6

Counterclaim Defendants' argument that the status of this cause of action in Utah is "too uncertain" is not persuasive. *See* Mot. at 16–17. Counterclaim Defendants support their argument with a 1992 Utah Court of Appeals decision, *Walker v. Union Pac. R. Co.*, 844 P.2d 335 (Utah Ct. App. 1992), and a 2021 decision from this court, *Vox Mktg. Grp. v. Prodigy Promos*, 556 F. Supp. 3d 1280 (D. Utah 2021). However, more recent Utah cases confirm the claim's continuing viability. *See Vandermeide v. Young*, 296 P.3d 787, 791, 794, 797 (Utah Ct. App. 2013) (affirming award for trespass to chattels); *Nassi v. Hatsis*, 525 P.3d 117, 125 (Utah Ct. App. 2023) (reversing summary judgment against trespass-to-chattels claim). The *Vox* court did not have the benefit of *Nassi*, which followed two years later and provides additional guidance on Utah's treatment of the claim. Indeed, this court recently recognized the viability of the claim. *Power Block Coin, L.L.C. v. Song*, 705 F. Supp. 3d 1293, 1312 (D. Utah 2023) (citing *Nassi*, 525 P.3d at 122 & n.10). Other federal courts have managed to apply the claim, even in the "digital space," and even with limited state court guidance. *See, e.g.*, *Mortensen v. Bresnan Commc'n, L.L.C.*, No. CV 10-13-BLG-RFC, 2010 WL 5140454, at *8 (D. Mont. Dec. 13, 2010).

### B.     Counterclaim Defendants' tangibility argument fails

Counterclaim Defendants' tangibility argument fails here for the same reasons it fails against SIA's conversion claim, including the absence of any binding Utah authority establishing a tangibility requirement. *See supra* Part III.A. This argument also fails because SIA's trespass-to-chattels claim alleges interference not only with SIA's information but also with its website. AC ¶ 115. Counterclaim Defendants' own cited cases recognize the viability of trespass-to-chattels claims for interference with a website. *See Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1287–88 (D. Utah 2009) ("[T]he court believes that Utah would consider web pages as a

20

4932-6850-3661.v6

type of tangible property." (citing *South Central*, 951 P.2d at 223–24)); *see also Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 678–79 (N.D. Ohio 2010) (citation omitted)).

### C.      The Counterclaim adequately pleads interference and damages

Counterclaim Defendants' last argument—that the Counterclaim does not adequately allege Counterclaim Defendants used or intermeddled with a chattel—fares no better. *See* Mot. at 18. This argument appears to conflate the requirement of intermeddling with the necessary degree of damages. *See id.* What must be more than de minimis is not the intermeddling but the resulting damage. *See Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 359 (4th Cir. 2006) (explaining that trespass to chattels for computer intrusions do not allow actions "'for nominal damages for harmless intermeddlings'" (citation omitted)).

SIA has alleged that Counterclaim Defendants' interference—including unauthorized access of SIA's website, stealing SIA's information, and then publishing that information—caused SIA more than nominal damages, including "requiring SIA to change its website, logins, and identifying information," AC ¶ 111,[6] as well as "the cost of running a new election; the cost of hiring an outside forensic expert to investigate the election; the opportunity costs, organizational costs, and institutional harms to SIA, including the need to redirect resources from its normal operations to address the fallout of AFA, David, and Price's conduct; harm to SIA's reputation both generally and with its Members; and attorney fees to advise SIA regarding security and other issues raised by these events," *id.* ¶ 119. This is more than de minimis, and these categories of damages are recoverable. *See, e.g.*, *U.S. Bank Tr. Nat. Ass'n v. Venice MD LLC.*, 92 F. App'x 948,

---

[6] Reliance on damages alleged under the conversion claim poses no issue. *Nassi* recognizes these claims are closely related. *See Nassi*, 525 P.3d at 122 n.10 (citation omitted); *see also* AC ¶ 114.

4932-6850-3661.v6

957 (4th Cir. 2004) ("[A]dditional damages adequate to compensate an owner for other injurious consequences. . . may be allowed." (citation omitted) (applying Maryland law)).

To the extent Counterclaim Defendants argue this claim requires allegations of intermeddling placing a significant burden on the plaintiff's computer system, *see* Mot. at 18, that argument fails for at least two reasons. Counterclaim Defendants have not shown that is the only viable website-based theory of trespass to chattels. And even if they could, SIA's allegations that Price (at David's and AFA's request) downloaded SIA's information on a monthly basis, including, the "root file" and "all the documents and images . . . uploaded to the website each month," certainly qualifies as more than a de minimis interference with SIA's website. *See* AC ¶¶ 24, 26.

This argument also fails because SIA's claim is based not only on interference with SIA's website, but with SIA's confidential information as well. AC ¶ 115–119. "Interference with information stored on a computer may give rise to trespass to chattel if plaintiff is dispossessed of the information or the information is impaired as to its condition, quality or value." *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 899 (N.Y. Sup. Ct. 2008) (citations omitted)). As explained, Counterclaim Defendants' interference caused far more than de minimis damages, including rendering at least some of the information—e.g., the voting credentials, which had to be reissued—valueless. *See* AC ¶¶ 111, 119.

## V. THE COUNTERCLAIM ADEQUATELY PLEADS TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

This counterclaim alleges that Counterclaim Defendants tortiously interfered with SIA's contractual relationship with its members by engaging in improper conduct including but not limited to accessing and publishing SIA's confidential member information, thereby

4932-6850-3661.v6

compromising SIA's August 2023 election, among other damages. AC ¶¶ 124–131. Counterclaim Defendants first argue that Price, Grange, and Crossley, as SIA members, cannot be liable since they were parties to that contractual relationship. Mot. at 18–19. This is unconvincing. Just as Price, Grange, and Crossley have contractual relationships with SIA, so too does every other SIA member. That Price, Grange, and Crossley themselves have contractual relationships with SIA does not preclude liability for their interference with SIA's contractual relationships with its other 4,000 plus members. *See Ford Motor Credit Co. v. Daugherty*, No. CIV S042344LKKJFM, 2005 WL 1366455, at *3–4 (E.D. Cal. May 27, 2005) (finding defendants could be liable for tortious interference despite common commercial enterprise because there were separate contracts). Plaintiffs' authority does not support a contrary finding. *See Vazirani v. Heitz*, 741 F.3d 1104, 1108 (10th Cir. 2013) (affirming ruling that executives could not be held liable for tortious interference with plaintiff's contract with their employer because executives were acting within the scope of their duties and for the benefit of their employer and thus "[were] the employer" and stating that executives could be held liable if they had instead acted for their own purely personal reasons—as Price, Grange, and Crossley did here) (citations omitted)).

Counterclaim Defendants next argue this counterclaim does not plausibly allege improper means as against David and AFA because the Counterclaim does not allege that David or AFA personally "accessed, published, or took any steps to compromise the SIA election." *See* Mot. at 19–20. This argument is also unconvincing. Improper means exist when the defendant's means of interference are "contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 416 P.3d 401, 421 n.11 (Utah 2017) (citation omitted). This element is satisfied when a defendant "employs

4932-6850-3661.v6

a means that is independently tortious or wrongful." *See C.R. England v. Swift Transportation Co.*, 437 P.3d 343, 354 (Utah 2019). As explained, the Counterclaim adequately alleges that AFA and David may be held liable for violating the CFAA, as well as for conversion, trespass to chattels, and civil conspiracy. No more is required. *See id.*

## VI.    THE COUNTERCLAIM ADEQUATELY PLEADS CONSPIRACY

SIA's conspiracy counterclaim alleges two theories. First, that Counterclaim Defendants used unlawful means to further their lawful objective of advocating for AFA to replace SIA. AC ¶ 121. Second, that Counterclaim Defendants used unlawful means toward the unlawful end of compromising SIA's August 2023 election. *Id.* Both theories allege Counterclaim Defendants agreed to unlawfully obtain and misuse SIA's confidential member information in furtherance of their objectives. *Id.* Counterclaim Defendants argue that the first theory fails against AFA and David because the Counterclaim does not allege a meeting of the minds on an unlawful act. Counterclaim Defendants next argue that the second theory fails against all of them because there was no meeting of the minds regarding the unlawful objective of compromising the election.[7] These arguments are not persuasive.

A high degree of detail is not required to sufficiently plead meeting of the minds. Conspiracy plaintiffs do not need to "prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence." *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, 598 F. Supp. 3d 1264, 1284 (D. Utah 2022) (citation and quotation marks

---

[7] Counterclaim Defendants' Motion reflects a potential misunderstanding about SIA's conspiracy claim. To be clear, SIA alleges the Counterclaim Defendants conspired to unlawfully obtain SIA's confidential member information in furtherance of their objectives to campaign for AFA to replace SIA and to compromise SIA's election. AC ¶ 121. If the Court finds this inadequate, the solution is amendment. *See Unified Container*, 280 F.R.D. at 638.

4932-6850-3661.v6

omitted). Instead, meeting of the minds can be shown through behavior, including "[b]usiness behavior," *Unified Container, LLC v. Mazuma Cap. Corp.*, 280 F.R.D. 632, 638 (D. Utah 2012) (citation omitted), or "inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators," *Applied*, 598 F. Supp. 3d at 1284 (citation and quotation marks omitted); *see also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) ("Direct evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances." (citations omitted)). "Moreover, under Utah law, mere 'knowing and intentional participation' in the conspiracy is sufficient to establish a meeting of the minds." *Applied*, 598 F. Supp. 3d at 1284 (quoting *Lawrence v. Intermountain, Inc.*, 243 P.3d 508, 513 (Utah Ct. App. 2010)). Even a "tacit" understanding suffices. *See id.* (discussing Ohio law but noting Utah law is the "practical equivalent").

The Counterclaim sufficiently alleges a meeting of the minds by AFA and David to unlawfully obtain SIA's confidential member information. The Counterclaim alleges AFA is openly attempting to replace SIA as the FA's bargaining agent, an outcome that could net AFA $3 million in dues annually. AC ¶¶ 2, 15–16. David works for AFA as a "Mobilization Coordinator" for that campaign. *Id.* ¶ 10. The other Counterclaim Defendants—Price, Grange, and Crossley— are or were SkyWest Flight Attendants and SIA members who support AFA and have worked with David and AFA to that end. *E.g.*, *id.* ¶¶ 4, 23–27. The Counterclaim alleges (supported by documents produced by Counterclaim Defendants in discovery) that Price learned he could wrongfully obtain SIA's confidential member information, *id.* ¶¶ 21–22, and sent that information to David and AFA. *Id.* ¶¶ 23–24. David expressed concern that using that information might be "sketchy" and that he needed to "check" with AFA about giving others at AFA access to that

information. *Id.* ¶ 25. Having apparently received AFA's approval, David then asked Price if he could "quietly download this info every month," *id.* ¶ 26, which Price agreed he could "definitely" do, *id.* ¶ 27. David forwarded the confidential information from Price to AFA's Strategic Campaign Lead and Research Assist Manager, asking them to "see if any of this info . . . may be useful" for AFA's campaign. *Id.* ¶ 28. Thus, the co-conspirators' behavior, relationships, and shared interests support the reasonable inference of a meeting of the minds. Indeed, David's request for Price to "quietly download" the information—which David recognized was at least potentially "sketchy"—and Price's agreement to do so leaves no room for doubt that what David and AFA were agreeing to do was not lawful.

Counterclaim Defendants' next argument—that the AC's second theory of conspiracy does not sufficiently allege a meeting of the minds to compromise SIA's election—also fails. The Counterclaim alleges that unlawfully obtaining SIA's confidential member information was an unlawful means in furtherance of both of the goals sought under both theories of conspiracy. AC ¶ 121. Counterclaim Defendants have not challenged a meeting of the minds among Price, Grange, and Crossley to unlawfully obtain SIA's information, *see* Mot. at 20–22, and as explained, the Counterclaim sufficiently alleges that with respect to David and AFA. Because a meeting of the minds exists with respect to the unlawful means, SIA does not also need to allege a meeting of the minds on an unlawful goal, as Counterclaim Defendants recognize. *See* Mot. at 21; *see also Pyper v. Reil*, 437 P.3d 493, 497 (Utah Ct. App. 2018) (explaining conspiracy requires "a meeting of the minds on the object or course of action" (citations omitted)). The Counterclaim in any case alleges this.

4932-6850-3661.v6

David's position and relationship with the other conspirators (on behalf of AFA), his request for Price to continue "quietly downloading" information he recognized may be "sketchy," and his knowledge of his and AFA's co-conspirators plans to use the information to blow up SIA's August 2023 election to discredit SIA, *see, e.g.*, AC ¶¶ 25–27 , 56–57—which would be a boon to David and AFA's campaign—together with the trail of group chat and WhatsApp communications between Price, Crossley, and Grange, (the latter of which David also received) strategizing how best to use the confidential information to accomplish that end, *id.* ¶¶ 35–72, provides more than ample support for the reasonable inference that all the co-conspirators had a meeting of the minds toward the unlawful goal of compromising SIA's election.[8] That David was only copied on the communications does not absolve him or AFA. On the contrary, his silence and lack of objection supports an inference of knowing and intentional participation. At this stage, this suffices. *See Applied*, 598 F. Supp. 3d at 1284 (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Counterclaim Defendants' Motion.

DATED October 3, 2025.

/s/ Christina M. Jepson
Erik A. Christiansen
Christina M. Jepson
Sarah Jenkins Dewey
PARSONS BEHLE & LATIMER

Gregg M. Formella
GREGG M. FORMELLA JD
*Attorneys for SkyWest InFlight Association*

---

[8] As the communications set out in the Counterclaim reflect, these were not "ordinary business communications." *Cf.* Mot. at 22 (citation omitted). Treating them as such would also require the Court to improperly draw an (unreasonable) inference against SIA.

4932-6850-3661.v6

## DUCivR 7-1(a)(6) CERTIFICATION

I certify that the foregoing SIA'S OPPOSITION TO COUNTERCLAIM DEFENDANTS'

MOTION TO DISMISS CERTAIN COUNTERCLAIMS contains 7,298 words and complies with

DUCivR 7-1(a)(4).

_/s/ Sarah Jenkins Dewey_

4932-6850-3661.v6

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, I caused a true and correct copy of the foregoing SIA'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTERCLAIMS to be filed on the Court's CM/ECF system which served all counsel of record appearing thereon.

/s/ *Christina M. Jepson*

4932-6850-3661.v6