UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS, AFL-CIO; SHANE PRICE; TRESA GRANGE; and BRANDON FINLEY,<br><br>     Plaintiffs,<br><br>v.<br><br>SKYWEST AIRLINES INC.; SKYWEST INFLIGHT ASSOCIATION,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [129] COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00723-DBB-DBP<br><br>District Judge David Barlow |
| SKYWEST INFLIGHT ASSOCIATION,<br><br>     Counterclaim Plaintiff,<br><br>v.<br><br>ASSOCIATION OF FLIGHT ATTENDANTS, AFL-CIO; SHANE PRICE; TRESA GRANGE; JACQUE CROSSLEY; and GAILEN DAVID,<br><br>     Counterclaim Defendants. | |

   Before the court is Counterclaim Defendants' Motion to Dismiss Certain Counterclaims against them.[1] They seek to dismiss six of the eight claims alleged against them in SkyWest InFlight Association's ("SIA") Amended Counterclaim.[2]

---

[1] Mot. to Dismiss for Failure to State a Claim ("MTD"), ECF No. 129, filed Aug. 14, 2025.
[2] Amended Counterclaim ("Counterclaim"), ECF No. 110, filed June 27, 2025.

# BACKGROUND

The counterclaims in this case arise from Counterclaim Defendants' alleged access to and publication of information stored on SIA's secure computer system.[3] SIA is a labor organization that represents flight attendants of SkyWest airlines.[4] It asserts counterclaims against three SkyWest flight attendants, Shane Price, Jacque Crossley, and Tresa Grange.[5] It also asserts claims against the Association of Flight Attendants ("AFA") and its agent, Gailen David.[6] Defendant SIA alleges the following.

AFA is seeking to replace SIA as the labor representative for SkyWest flight attendants, and David is AFA's representative in Utah for this purpose.[7] Price, Crossley, and Grange support AFA and helped campaign on its behalf.[8] In April 2023, Price learned that he could enter SIA's password protected website and then manipulate the URL to access non-public information, like the names, identification numbers, and voting credentials of other SkyWest flight attendants.[9] Price did not inform SIA about this flaw.[10] Instead, he forwarded access instructions and links to SIA documents to Crossley and David.[11] After some discussion, David asked Price to "quietly download this information every month," which Price agreed to do.[12]

In August 2023, SIA held an election to select its SkyWest flight attendant representatives.[13] The election required flight attendants to log into a third-party website using

---

[3] *See id.*
[4] *Id.* ¶¶ 1, 5.
[5] *Id.* ¶¶ 3–4.
[6] *Id.* ¶ 2.
[7] *Id.* ¶ 10.
[8] *Id.* ¶¶ 2–4.
[9] *Id.* ¶ 21.
[10] *Id.*
[11] *Id.* ¶¶ 24–28.
[12] *Id.*
[13] *Id.* ¶¶ 29–30.

individualized credentials to cast their ballots.[14] These credentials were stored in a password-protected partition within SIA's website.[15] During the election, Price, Grange, and Crossley messaged each other privately and in a group chat to discuss accessing these private credentials through the flaw that Price had discovered.[16] Grange and Price both accessed the information, and the three flight attendants considered filing a grievance based on the potential for vote manipulation.[17] Price made a video documenting the flaw and showing how it could be exploited to manipulate the election.[18]

Price, Crossley, and Grange then brought their plan to a separate group chat that included them, other pro-AFA flight attendants, and David.[19] The flight attendants discussed how to release evidence of the flaw, who would do so, and when to release it so as to best "undermine SIA's election integrity."[20] At one point, Grange posted a message in the chat asking David for advice, but David never responded to or participated in the conversation about exposing the election flaws.[21] On August 15, 2023, Grange posted the video Price made on Facebook and SkyWest company forums.[22] She also posted a link to access the confidential information.[23] As a result, the third-party election platform refused to certify the election.[24] SIA was also forced to create new voting credentials for each of its members.[25]

---

[14] *Id.* ¶¶ 31–32.
[15] *Id.*
[16] *Id.* ¶¶ 35–43.
[17] *Id.*
[18] *Id.*
[19] *Id.* ¶¶ 44–47.
[20] *Id.* ¶¶ 49–68.
[21] *Id.* ¶¶ 56–57, 65.
[22] *Id.* ¶¶ 69–71.
[23] *Id.* ¶ 71.
[24] *Id.* ¶ 75; The subsequent investigation also revealed that another flight attendant who is not a party to this suit had fraudulently utilized confidential information to cast ballots for herself on behalf of other flight attendants. *Id.* ¶ 77.
[25] *Id.* ¶ 82.

## STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is plausible on its face."[26] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27] "In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings."[28] Conclusory statements and legal conclusions are "not entitled to the assumption of truth."[29]

## DISCUSSION

SIA asserts eight counterclaims against Counterclaim Defendants, but they only argue that six of the claims should be dismissed under Rule 12(b)(6).[30]

## I.    Computer Fraud and Abuse Act ("CFAA")

SIA's first cause of action alleges that Counterclaim Defendants violated 18 USCA § 1030, the Computer Fraud and Abuse Act or "CFAA."[31] For purposes of this motion, Counterclaim Defendants seek only to dismiss the CFAA claim as to AFA, David, and Crossley.[32] The CFAA is a criminal statute that broadly prohibits unauthorized access to

---

[26] *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (citing *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019)).
[27] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).
[28] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130–31 (10th Cir. 2024) (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)) (also quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)) (cleaned up).
[29] *Iqbal*, 556 U.S. at 1951 (emphasis omitted).
[30] MTD 7.
[31] Counterclaim ¶¶ 85–88.
[32] MTD 11 n.5.

protected computers.[33] It imposes criminal liability on anyone who, among similar acts, "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."[34] The statute also criminalizes conspiracies and attempts to do the same.[35] SIA seeks civil liability under section (g) of the CFAA, which allows "[a]ny person who suffers damage or loss by reason of a violation of this section" to maintain an action for civil liability "against the violator to obtain compensatory damages."[36] Here, the parties dispute whether David, AFA, and Crossley "accessed" SIA's website without authorization and whether they conspired for Price to do so.[37]

### A. Access and Inducement

The CFAA only creates a civil cause of action against a "violator" of the statute.[38] SIA's Counterclaim alleges that Price directly logged into the SIA website and used "hacking techniques" to access confidential information.[39] But it does not allege that David, Crossley, or AFA ever directly accessed the site or the confidential information, only that they supported and encouraged Price to do so.[40] David, Crossley, and the AFA argue that this precludes a CFAA claim against them because they did not actually violate the act and because the act creates no vicarious liability for aiding and abetting a primary violator.[41] SIA responds that the plain

---

[33] 18 USCA § 1030(a)(1).
[34] 18 USCA § 1030(a)(2).
[35] 18 USCA § 1030(b).
[36] 18 USCA § 1030(g). This provision only applies if the alleged conduct meets one or more of several enumerated factors, including losses of at least $5,000 in value, which is alleged here. Counterclaim ¶ 88.
[37] MTD 14–15.
[38] 18 USCA § 1030(g).
[39] Counterclaim ¶ 86.
[40] *Id.*
[41] MTD 12.

language of the CFAA only requires "access," not "personal access," and that inducing another to access a protected computer also qualifies as "access" under the statute.[42]

To begin, the CFAA creates no civil liability for aiding and abetting a primary violator of the statute. The United States Supreme Court has stated that "Congress has not enacted a general civil aiding and abetting tort liability statute, but has instead taken a statute-by-statute approach to such liability."[43] Because the CFAA does not include the words "aid" or "abet," or any language creating vicarious liability,[44] it does not create any civil liability based on aiding and abetting a violator.[45] SIA contends that "inducing another to access a computer they otherwise would not have been authorized to use constitutes 'access' within the CFAA's coverage."[46] In doing so, SIA attempts to distinguish inducing a CFAA violation from aiding and abetting a CFAA violation. SIA essentially argues that one person inducing another to access a protected computer also qualifies as the first person accessing that same computer under the plain meaning of the word access.[47] Courts are split about whether "access" under the CFAA inherently includes inducing another to access a protected computer.[48] This court holds that it does not.

---

[42] Opp'n to Mot. to Dismiss ("Opp'n") 8–9, ECF No 145, filed Oct. 3, 2025.

[43] *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 165 (1994).

[44] *See* 18 USCA § 1030.

[45] *See Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*, No. 2:20-CV-352-JNP-DAO, 2021 WL 5772269, at *8 (D. Utah Dec. 6, 2021) ("Congress has repeatedly shown that it knows how to impose aiding and abetting liability when it so desires. But, here, it imposed no such liability. The CFAA creates liability only for individuals who violate the statute . . .. Aiding and abetting is not enumerated as a means of violating the CFAA.").

[46] Opp'n 8.

[47] *Id.*

[48] *See Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) ("The court joins those before it which have held that the act of inducing another to access a protected computer that he or she is otherwise not authorized to use constitutes "access" within the meaning of the CFAA."); *Ryanair DAC v. Booking Holdings Inc*., 636 F. Supp. 3d 490, 499 (D. Del. 2022); *but see Power Equip. Maint., Inc. v. AIRCO Power Servs., Inc.*, 953 F. Supp. 2d 1290, 1297 (S.D. Ga. 2013) ("[T]hat allegation does not even include any access at all by [Defendant], just that he managed to convince another with access to provide him with the information. Clearly, the CFAA requires that the individual actually access the information, not merely receive it from a third party."); *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1343–44 (N.D. Ga. 2017).

First, other federal aiding and abetting statutes do not support this distinction. While there is no general aiding and abetting liability statute in a civil context, a criminal aiding and abetting statute does exist.[49] 18 U.S.C. § 2 creates criminal liability for anyone who "aids, abets, counsels, commands, induces or procures" or "willfully causes" a criminal offense. Notably, this statute includes inducement as a separate theory from direct liability.[50] Other aiding and abetting provisions relating to civil liability in federal statutes also expressly create liability for inducing, ordering, or causing a prohibited act separately from committing the act itself.[51] When Congress wishes to impose liability for inducing a prohibited act, such liability is included in the relevant statute, and no inducement liability is included here.

Second, many of the cases that define "access" to include inducing or encouraging a third party to enter a protected computer system do so in the context of agency relationships.[52] In an agency context, an agent's acts within the scope of the agency are imputed to the principal.[53] Therefore, a principal who instructed its agent to access a protected computer might be said to have "accessed" that same computer via the agent's action. But the plain meaning of the term "access" does not encompass vicarious liability for encouragement or inducement in the absence

---

[49] 18 U.S.C.A. § 2; *see also United States v. Hansen*, 599 U.S. 762, 779 (2023) (referring to 18 U.S.C.A. § 2 as "the federal aiding-and-abetting statute.").

[50] *Id.*

[51] *See* 7 U.S.C.A. § 25(a)(1); 15 U.S.C.A. § 689n(a).

[52] *See, e.g.*, *MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*, No. 19-CV-00938-MEH, 2019 WL 5189004, at *5 (D. Colo. Oct. 15, 2019) ("While courts have applied vicarious liability to find plausible claims against entity Defendants, they point to allegations in which the entities 'urge' or 'direct' their agents to engage in the CFAA's prohibited conduct."); *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *7 (N.D. Ill. Sept. 27, 2005) ("To hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal."); *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *7 (N.D.N.Y. Dec. 12, 2011) ("To state a claim for vicarious liability under the CFAA, a plaintiff must allege facts that would plausibly suggest that (1) the defendant affirmatively urged or encouraged its employee to violate the CFAA, and (2) the employee committed such a violation.").

[53] *See* Restatement (Third) Of Agency § 7.03 (2006) ("A principal is subject to direct liability to a third party harmed by an agent's conduct when (a) . . . the agent acts with actual authority or the principal ratifies the agent's conduct and . . . (ii) the agent's conduct, if that of the principal, would subject the principal to tort liability").

7

of such an agency relationship. Webster's Dictionary defines "access" as "(a) to be able to use, enter, or get near (something)" or "(b) to open or load (a computer file, an Internet site, etc.)."[54] The CFAA does not prohibit accessing information, but rather the protected computer itself.[55]

In this case, the counterclaim does not allege facts showing that Price acted subject to Crossley, David, or AFA's control or manifested assent to work on their behalf.[56] Instead, it pleads facts showing that Price worked alongside the other counterclaim defendants in pursuit of a common goal.[57] In the absence of an agency relationship, David's message to Price asking, "[c]an we quietly download this information every month?" along with Price's later entrance into the SIA website does not indicate that David, AFA, or Crossley entered, opened, loaded, or accessed SIA's protected computer.[58] Instead, these allegations, together with others, plausibly assert conspiracy, which is addressed below.

### B. CFAA Conspiracy

The CFAA also prohibits conspiring to access a protected computer to obtain information.[59] Thus, conspiring to commit an offense under the statute is itself a violation of the statute. SIA argues that Counterclaim Defendants also violated the statute through such a conspiracy.[60] Engaging in a CFAA conspiracy would make them civilly liable under § 1030(g).[61] Counterclaim Defendants respond by arguing that SIA cannot amend its counterclaim to include

---

[54] *Access*, Merriam Webster Dictionary (11th ed. 2003), https://www.merriamwebster.com/dictionary/access#dictionary-entry-2.
[55] 18 USCA § 1030(a).
[56] *See* Restatement (Third) Of Agency § 1.01 (2006).
[57] Counterclaim ¶¶ 24–27.
[58] *Id.* ¶ 26.
[59] 18 USCA § 1030(b).
[60] Opp'n 10.
[61] 18 USCA § 1030(g).

a CFAA conspiracy claim and that such a claim cannot support civil liability regardless.[62] They also contend that SIA has not sufficiently alleged the elements of a conspiracy.[63]

The CFAA prohibits conspiring to violate § 1030(a).[64] Therefore, a conspiracy to violate subsection (a) is one way to violate the statute. The counterclaim alleges that Counterclaim Defendants violated the CFAA,[65] so analyzing that alleged violation as a conspiracy under § 1030(b) is not an amendment to the counterclaim. It was already contemplated in the first cause of action. Additionally, the plain language of the conspiracy subsection does not limit its application to civil liability. It is true that § 1030(b) states that violators "shall be punished as provided in subsection (c)," but § 1030(a) includes the exact same language.[66] Simply put, § 1030(b) makes it a violation to conspire to violate § 1030(a), so violating subsection (a) directly or conspiring to do so under subsection (b) both qualify as statutory violations that give rise to civil liability under § 1030(g).[67]

The court must next decide whether the counterclaim pleads sufficient facts to plausibly support a CFAA conspiracy claim against Counterclaim Defendants under § 1030(g). It does. Because the CFAA is a federal criminal statute, the court applies federal conspiracy standards.[68] SIA must plausibly allege that "(1) two or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and

---

[62] Reply to Mot. to Dismiss ("Reply") 4, ECF No. 150, filed Oct. 17, 2025.

[63] *Id.*

[64] 18 USCA § 1030(b).

[65] Counterclaim ¶¶ 85–88.

[66] 18 USCA § 1030(a), (b).

[67] *Podium Corp. Inc. v. Chekkit Geolocation Servs., Inc.*, No. 2:20-CV-352-JNP-DAO, 2021 WL 5772269, at *8 (D. Utah Dec. 6, 2021) ("The CFAA creates liability only for individuals who violate the statute, or any individual who conspires to commit or attempts to commit an offense under the statute.").

[68] *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1184–85 (D. Colo. 2019).

voluntarily participated in the conspiracy; and (4) the alleged coconspirators were interdependent."[69] Here, the counterclaim alleges that Price, Crossley, and David (as AFA's agent) communicated about how Price had accessed SIA's confidential site and discussed whether Price should continue to access the site and gather information.[70] They ultimately agreed that Price should access the website monthly to gather information.[71] These facts plausibly allege that Counterclaim Defendants agreed that Price would access SIA's website in violation of the CFAA and that such access for information was the known objective. Their discussion about whether to move forward and how also supports their voluntary participation and that they were all involved in furthering the scheme to the point of interdependence.[72]

Because the counterclaim alleges facts to plausibly support a finding that Counterclaim Defendants conspired to violate the CFAA through Price's actions, and because such a conspiracy is a valid basis for civil liability under § 1030(g), SIA's first cause of action plausibly states a claim. However, it only states a claim against Crossley, AFA, and David for violating § 1030(b), not § 1030(a).

## II.    Stored Communications Act ("SCA")

SIA's next cause of action alleges that Price and Grange violated 18 U.S.C.A. § 2701, the SCA, by accessing the SIA website without authorization.[73] Under the SCA,

---

[69] *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011) (quoting *United States v. Yehling,* 456 F.3d 1236, 1240 (10th Cir. 2006)).
[70] Counterclaim ¶¶ 24–28.
[71] *Id.*
[72] *United States v. Johnson*, 821 F.3d 1194, 1203 (10th Cir. 2016) ("Interdependence is present if the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole.").
[73] Counterclaim ¶¶ 89–93.

> [W]hoever—
> **(1)** intentionally accesses without authorization a facility through which an electronic communication service is provided; or
> **(2)** intentionally exceeds an authorization to access that facility;
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.[74]

The statute also creates a civil cause of action for "any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter" that was committed with "a knowing or intentional state of mind."[75] Thus, a cause of action under the SCA requires allegations that a defendant (1) intentionally accessed (2) without authorization (3) a facility through which an electronic communication service is provided and (4) obtained access to a wire or electronic communication (5) in electronic storage in the system.[76] Counterclaim Defendants argue that the Counterclaim fails to allege facts showing that the SIA website is a facility through which electronic communication services are provided and that the confidential information does not qualify as a wire or electronic communication.[77]

### A.    Facility

Counterclaim Defendants first argue that the SIA website is not a qualifying "facility" under the SCA. The statute does not define "facility," but electronic communication service is defined to mean "any service which provides to users thereof the ability to send or receive wire or electronic communications."[78] "Courts have interpreted the statute to apply to providers of a communication service such as telephone companies, Internet or e-mail service providers, and

---

[74] 18 U.S.C.A. § 2701(a).
[75] 18 U.S.C.A. § 2707(a).
[76] 18 U.S.C.A. § 2701(a).
[77] MTD 18–19.
[78] 18 U.S.C.A. § 2711(a)(1); 18 U.S.C.A. § 2510(15).

11

bulletin board services."[79] In other words, "the statute applies to companies that *provide* an electronic communication service."[80]

SIA argues that its website qualifies as a "facility through which an electronic communication service is provided" because it is "akin to email and electronic bulletin boards."[81] Specifically, it claims that it "transmitted information to its members—including their individualized voting credentials—via a protected portion of SIA's website from which members would access and retrieve their voting credentials."[82] The "bulletin board system" of communication under the SCA was first described as a possibility in *Steve Jackson Games v. U.S. Secret Service*.[83] In that case, the bulletin board consisted of a system that was used to send and receive private email and post public information.[84] However, the Counterclaim does not support a similar argument here.

The Counterclaim never alleges that SIA transmitted any information to its members through its website or that individual members could access the protected portion of the site to retrieve their voting credentials.[85] Even the portions of the Counterclaim cited by SIA in its argument only allege that the confidential information included employee names, numbers, and passwords that were stored in non-public areas of the website.[86] Notably absent are any facts indicating or suggesting that this information was communicated to members through the

---

[79] *Cent. Bank & Tr. v. Smith*, 215 F. Supp. 3d 1226, 1234 (D. Wyo. 2016); *Satcom Sol. & Res. LLC v. Pope*, No. 19-CV-02104-CMA-GPG, 2020 WL 4511773, at *6 (D. Colo. Apr. 20, 2020), report and recommendation adopted, No. 19-CV-02104-CMA-NRN, 2020 WL 2188922 (D. Colo. May 6, 2020).

[80] *Satcom*, 2020 WL 4511773, at *6 (emphasis in original).

[81] Opp'n 14.

[82] *Id.*

[83] *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 458 (5th Cir. 1994); *Cent. Bank & Tr. v. Smith*, 215 F. Supp. 3d 1226, 1234 (D. Wyo. 2016).

[84] *Steve Jackson Games, Inc.*, 36 F.3d at 458.

[85] *See generally* Counterclaim.

[86] *Id.* ¶¶ 4, 21, 31–32.

website. Essentially, SIA seems to be arguing that its website should qualify as a bulletin board if any member is able to log in and see information stored on the site. This is a far cry from an email system used to facilitate back-and-forth communication, like the one present in *Steve Jackson Games.*[87]

The nature of the confidential information in question also undermines SIA's "bulletin board" argument. SIA alleges that the confidential information consisted of lists and spreadsheets containing the personal information of many SIA members.[88] Thus, any single member accessing these lists would obtain confidential information concerning many other members as well, disclosure that renders the information "valueless" according to SIA.[89] Even if the Counterclaim did allege that individual SIA members could log onto the website to view their information, it is unclear if this would qualify as a "bulletin board system." Regardless, the Counterclaim does not plead facts that plausibly allege any communication at all via the SIA site, so it cannot qualify as a facility through which a "service which provides to users thereof the ability to send or receive wire or electronic communications" is offered.[90]

### B.    Electronic Communications

Counterclaim Defendants also argue that the lists of confidential information do not qualify as "electronic communications."[91] Electronic communication in the SCA means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that

---

[87] *Steve Jackson Games, Inc*., 36 F.3d at 458.
[88] *Id.* ¶¶ 21, 24, 32, 38, 47.
[89] Opp'n 19.
[90] 18 U.S.C.A. § 2701(a); 18 U.S.C.A. § 2510(15).
[91] MTD 18.

affects interstate or foreign commerce."[92] SIA contends that this definition is broad and

"encompasses things like email and non-public bulletin board posts."[93] Even so, the

Counterclaim still lacks factual allegations that the confidential information in question qualifies

as a "transfer of . . . data."[94]

   As already discussed, the Counterclaim states that the information Counterclaim

Defendants obtained consisted of lists of personal information that were stored in a confidential

partition so as not to be accessible.[95] While the personal information in these lists may have been

communicated piecemeal to individual members through some unspecified means, there is no

indication that the lists themselves were "electronic communications" rather than documents

stored privately on a website. To classify such documents as "electronic communications" that

transfer data merely because some SIA official or member could access the SIA website and see

the information stored there would expand the scop of the SCA to cover all information stored on

any website. For these reasons, the Counterclaim fails to state a claim for a violation of the

Stored Communications Act.[96]

## III. Conversion

   SIA also alleges a claim for conversion against AFA, David, and Price. In Utah, a

conversion claim requires a party to show "'an act of willful interference with property, done

without lawful justification, by which the person entitled to property is deprived of its use and

---

[92] 18 U.S.C.A. § 2510(12).
[93] Opp'n 15.
[94] 18 U.S.C.A. § 2510(12).
[95] Counterclaim ¶ 32.
[96] Defendant SkyWest Airlines, Inc. also filed a partial opposition to the Motion to Dismiss that focused solely on the SCA claims. *See* SkyWest Partial Opp'n to Motion to Dismiss, ECF No. 149, filed Oct. 15, 2025. Because SkyWest's counterclaims are not before the court, the court does not consider this additional briefing.

possession,' and that the party 'is entitled to immediate possession of the property at the time of the alleged conversion.'"[97] Counterclaim Defendants argue that this claim fails because Utah does not recognize conversion of intangible property, SIA does not allege that it was deprived of the information, and the information lacked monetary value.[98] SIA disputes that its confidential information is intangible property.[99] It also argues that it was deprived of the information because it was forced to change the passwords after the breach and that it suffered damages as a result.[100]

The first question is whether the counterclaim alleges conversion of any tangible property.[101] Counterclaim Defendants rely primarily on *Kirkham v. Widdison* for the assertion that conversion cannot include intangible property.[102] In *Kirkham*, a divorced couple argued over who could retroactively claim the tax exemption for their minor child.[103] The mother had previously claimed the exemptions, and as part of the litigation she produced her tax returns for those years.[104] The father used the information on those forms to prepare pro forma returns showing that the parties would receive greater net benefits if the father claimed the exemption and shared the return.[105] The court ordered the mother to file the pro forma returns, and when she refused to do so, the court ordered the forms to be signed and submitted on her behalf.[106] The

---

[97] *Rand v. KOA Campgrounds*, 2014 UT App 246, ¶ 11, 338 P.3d 222, 225 (quoting *Jones & Trevor Mktg., Inc. v. Lowry,* 2010 UT App 113, ¶ 15 n. 13, 233 P.3d 538).
[98] MTD 20.
[99] Opp'n 16.
[100] *Id.* at 18–19.
[101] SIA states in its opposition that Utah does not limit conversion to tangible things, yet it cites caselaw to the contrary and argues only that the information here is not intangible. Opp'n 16.
[102] MTD 20.
[103] *Kirkham v. Widdison*, 2019 UT App 97, ¶ 2, 447 P.3d 89, 93.
[104] *Id.*
[105] *Id.*
[106] *Id.* at 93–94.

mother sued the father for conversion of her personal private information for using it to prepare the tax forms and sending it to tax professionals.[107]

The trial court dismissed this claim, and the Utah Court of Appeals upheld the dismissal.[108] The appellate court recognized that the trial court determined the wife's "tax status is not property that can be converted."[109] However, the appellate court also noted that the issue was whether "whether the underlying information used in the returns" was subject to conversion rather than the returns themselves.[110] The court found that it was not and explicitly declined to "expand the definition of a chattel to apply to intangible property" by holding that "the personal information in [] tax returns should be considered property subject to conversion."[111]

The Utah Supreme Court has not spoken on the issue of tangible property and conversion, but *Kirkham* does not suggest that Utah state courts would recognize intangible property as being subject to conversion. Several cases in this court have made the same prediction.[112] This court sees no reason to reach a different conclusion. Utah does not seem to allow conversion claims for intangible property, including personal information.[113] SIA disputes that personal information is intangible, arguing that the court in *Kirkham* was discussing tax

---

[107] *Id.*

[108] *Kirkham*, 447 P.3d at 97.

[109] *Id.*

[110] *Id.* at n.11.

[111] *Id.* at 98.

[112] *See Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1160 (D. Utah 2018) ("The court agrees with Defendants that Plaintiffs' names, addresses, and other personal information are intangible property. Because Utah would likely not allow a conversion claim for intangible property, Plaintiffs' conversion of identity claim fails."); *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009) ("An expansion of conversion liability to cover intangible property does not appear likely in a state that follows the Restatement (Second) of Torts for guidance. That is because the Restatement generally limits conversion actions involving intangible property to intangible property that is customarily merged in a document.").

[113] *Kirkham*, 447 P.3d at 97.

status rather than information.[114] However, the Utah Court of Appeals' analysis in *Kirkham* clearly indicates that the property in question was the "underlying information used in the returns."[115]

SIA also argues that the information is tangible because it exists as electronic computer files that contain the information.[116] As SIA points out, the Utah Supreme Court has even acknowledged that "the electronic signals of installed software are tangible."[117] Here, however, SIA's conversion claim only states that Price unlawfully downloaded the confidential information and that Counterclaim Defendants interfered with SIA's possession of that information.[118] The fifth cause of action is focused on the information itself, not the tangible electronic files in which it is contained. Even if the claim did allege that the files were converted, it states no facts showing that SIA lost any ability to access, possess, or use those files, only that the information contained within them became less valuable.[119] Just like in *Kirkham* where the court distinguished between the information contained in the tax returns and the tax forms themselves,[120] here the conversion claim is based on the information contained in SIA's electronic files. Because that information is intangible property, the Counterclaim fails to state a claim for conversion. The court need not decide if SIA sufficiently alleges that it was deprived of its confidential information or the value of that information because the information is intangible and cannot supply the basis for a conversion claim regardless.

---

[114] Opp'n 16.
[115] *Kirkham*, 447 P.3d at 97 n.11. The *Kirkham* court also discussed the legal justification and deprivation elements of conversion in the context of the personal information rather than the tax status. *Id.* at 97–98.
[116] Opp'n 16–17.
[117] *S. Cent. Utah Tel. Ass'n, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 951 P.2d 218, 223 (Utah 1997).
[118] Counterclaim ¶¶ 109–112.
[119] *See generally* Counterclaim.
[120] *Kirkham*, 447 P.3d at 97 n.11.

IV.    **Trespass to Chattels**

SIA next alleges a claim for trespass to chattels against Price, David, and AFA based on Price's interference with SIA's confidential information and website.[121] Conversion claims and trespass to chattels claims are similar, the differences largely resting on the seriousness of interference with the property and the "scope of the available damages."[122] In Utah, "trespass to chattels is understood to occur when one 'intentionally (a) dispossesses another of the chattel, or (b) uses or intermeddles with a chattel in the possession of another.'"[123] A trespass to chattels claim requires the plaintiff to show "some damage to the chattel in question."[124]

As already discussed, the Utah Court of Appeals has declined to "expand the definition of a chattel to apply to intangible property," including personal information.[125] For the reasons stated in the court's analysis of SIA's conversion claim, the confidential information here is not tangible chattel under Utah law and cannot be the basis for a trespass to chattels claim. However, unlike in its conversion cause of action, SIA also bases its trespass claim on Counterclaim Defendants' alleged interference with the website itself, not just the information contained therein.[126] In *Margae v. Clear Link Technologies*, this court recognized that "there is a distinction between the information displayed on the web page, which is intangible, and the web

---

[121] Counterclaim ¶ 115.
[122] *Nassi v. Hatsis*, 2023 UT App 9, ¶ 23, 525 P.3d 117, 122 n.10; *see also Power Block Coin, L.L.C. v. Song*, 705 F. Supp. 3d 1293, 1312 (D. Utah 2023) ("the difference between trespass to chattels and conversion is immaterial where there is a wrongful taking and carrying away of the property of another").
[123] *Nassi*, 525 P.3d at 122 (quoting Restatement (Second) of Torts § 217 (Am. L. Inst. 1965)) (cleaned up).
[124] *Walker v. Union Pac. R. Co*., 844 P.2d 335, 343 n.9 (Utah Ct. App. 1992); *see also* Restatement (Second) of Torts § 218 (1965), Comment (e) ("The interest of a possessor of a chattel in its inviolability . . . is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. . . . one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time").
[125] *Kirkham v. Widdison*, 2019 UT App 97, ¶ 25, 447 P.3d 89, 97.
[126] Counterclaim ¶ 115; Opp'n 20–21.

page itself."[127] There, the court found a website to be tangible property in the context of a conversion claim.[128] Unlike intangible information, a website can be "physically altered" by authorized or unauthorized users, and access to and use of a website can be restricted or denied.[129] Therefore, SIA's website qualifies as chattel that could form the basis for its trespass claim.

Because SIA's website qualifies as tangible chattel that can support a trespass to chattels claim, the court must next determine whether SIA alleges facts to plausibly state such a claim. It does not. As mentioned, trespass to chattels requires either some dispossession of the property or damage to the property.[130] In this case, the Counterclaim alleges no facts indicating that SIA ever lost possession of its website or that the website was damaged.[131] While Counterclaim Defendants' release of the information contained within the website made that information valueless,[132] neither SIA's trespass claim nor its arguments here allege any damage to or dispossession of the SIA website.[133] Therefore, the Counterclaim fails to plausibly state a claim for trespass to chattels.

## V.    Tortious Interference with Contractual Relationships

SIA also alleges tortious interference with contractual relationships against Price, Grange, Crossley, David, and AFA.[134] This claim is based on the contractual relationship between SIA

---

[127] *Margae, Inc. v. Clear Link Techs., LLC*, 620 F. Supp. 2d 1284, 1288 (D. Utah 2009).
[128] *Id.*
[129] *Id.*
[130] *Nassi*, 525 P.3d at 122; *Walker*, 844 P.2d at 343 n.9.
[131] *See generally* Counterclaim.
[132] Opp'n 22.
[133] *See* Counterclaim ¶ 119; Opp'n 21–22.
[134] Counterclaim ¶¶ 124–131.

and its members.[135] Counterclaim Defendants argue that Price, Grange, and Crossley cannot be liable for causing a breach of their own contracts and, alternatively, that the Counterclaim fails to allege any breach by non-party flight attendants.[136] As for David and AFA, they contend that there are no allegations that either one "accessed the SIA Member Information, published it, or took any steps to compromise the SIA election," or used improper means to do so.[137]

A claim of tortious interference with contractual relations requires proof that "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."[138] "[I]n the absence of any improper means, an improper purpose is not grounds for tortious interference liability."[139] An improper means is one that is "independently tortious or wrongful . . . such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession."[140] "A party is subject to liability for an intentional interference with *present* contractual relations if he intentionally and improperly causes one of the parties not to perform the contract."[141] Thus, a tortious interference claim based on an existing contract must allege that the defendant caused a breach of that contract or impaired its performance through improper means.[142]

---

[135] *Id.*
[136] Reply 9.
[137] MTD 25.
[138] *Com. Club Bldg. LLC v. Glob. Rescue LLC*, 2023 UT App 37, ¶ 54, 529 P.3d 382, 394 (quoting *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553).
[139] *Eldridge*, 345 P.3d at 565.
[140] *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 32, 459 P.3d 1060, 1069 (quoting *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 45, 437 P.3d 343).
[141] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (citing Restatement (Second) of Torts § 766 (1979)) (emphasis in original).
[142] *See id.*

20

### A. Flight Attendant Counterclaim Defendants

SIA alleges that its relationship with each of its thousands of flight attendant members is contractual and that Counterclaim Defendants "intentionally interfered with this relationship by engaging in improper conduct."[143] "It is settled that one party to a contract cannot be liable for the tort of interference with contract for inducing a breach by himself or the other contracting party."[144]

Price, Grange, and Crossley were members of SIA at the time the events in the Counterclaim occurred,[145] so they cannot be liable for tortiously interfering with their own contracts. However, they can be liable for improperly interfering with SIA's contractual relations with its other members. Counterclaim Defendants argue that, even in the context of interference with SIA's contracts with its other members, the claim fails as to Price, Grange, and Crossley because the Counterclaim does not allege that any other members breached their contracts due to their conduct.[146] But they fail to identify any Utah law requiring that third parties must have breached.[147]

SIA does not include any contractual provisions in its tortious interference cause of action or specifically allege what breaches occurred.[148] However, SIA does plead facts stating that it was required by its bylaws to hold secret ballot elections to choose flight attendant

---

[143] Counterclaim ¶¶ 125–128.
[144] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982), overruled in part on other grounds by *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553.
[145] Counterclaim ¶¶ 3, 5.
[146] Reply 9.
[147] *See St. Benedict's*, 811 P.2d at 201 (stating only that a defendant must "intentionally and improperly cause[] one of the parties not to perform the contract"); *see also* Restatement (Second) of Torts § 766A (1979) ("Intentional Interference with Another's Performance of His Own Contract.").
[148] *See* Counterclaim ¶¶ 124–121.

representatives in the organization.[149] In Utah, the bylaws of a corporation "constitute a contract between the member and the corporation."[150] Other states also apply this principle to non-corporate entities like labor organizations.[151] The binding nature of bylaws is settled under Utah law,[152] so Utah would likely recognize that the bylaws of a labor organization constitute, in part, that organization's contract with its members.

SIA claims that, due to Counterclaim Defendants' actions, it was unable to carry out its contractual obligations in holding the election and was forced to hold a new election at great expense.[153] This plausibly alleges that Price, Grange, and Crossley caused SIA to breach its contract with the other members or at least impaired its ability to perform. The Counterclaim also plausibly alleges that they did so through improper means. SIA states that Price, Grange, and Crossley undermined its election by agreeing to access SIA's protected website, obtain information, and release it.[154] As the court will later discuss in greater detail, these alleged facts are sufficient to plausibly state a claim that the flight attendant counterclaim defendants conspired to violate the CFAA for the purposes of undermining SIA's election. Such a conspiracy is itself a violation of the CFAA.[155] Therefore, the Counterclaim sufficiently alleges that Price, Grange, and Crossley interfered with SIA's ability to fulfill its contractual obligation

---

[149] *Id.* ¶ 29.
[150] *Turner v. Hi-Country Homeowners Ass'n*, 910 P.2d 1223, 1225 (Utah 1996).
[151] *See, e.g., Hogan v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employes*, 629 F. Supp. 1166, 1172 n.11 (W.D. Va. 1986), *aff'd sub nom. Hogan v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps*., 817 F.2d 248 (4th Cir. 1987) ("the relationship between the union and its members is contractual. The union's Constitution and bylaws constitute the contract between the union and its members"); *Diamond v. United Food & Com. Workers Union Loc. 881*, 329 Ill. App. 3d 519, 524, 768 N.E.2d 865, 869 (2002) (same); *Int'l Ass'n of Fire Fighters v. Moon*, 364 S.W.3d 647, 652 (Mo. Ct. App. 2012) (same); *Int'l Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 618, 78 S. Ct. 923, 924, 2 L. Ed. 2d 1018 (1958) (same).
[152] *Workman v. Brighton Props., Inc*., 1999 UT 30, ¶ 10, 976 P.2d 1209, 1212.
[153] Counterclaim ¶¶ 75, 82.
[154] *Id.* ¶¶ 35–73.
[155] 18 USCA § 1030(b).

of holding an election by violating the CFAA. Violating a statute is "independently wrongful" and thus qualifies as improper means.[156] SIA states a claim for tortious interference with contractual relations against Price, Grange, and Crossley.

### B.  AFA Counterclaim Defendants

The parties argue over whether David and AFA acted "improperly,"[157] but the first question is whether the Counterclaim even alleges that they interfered with a contractual relation.[158] As already discussed, SIA does not list any contractual terms or allege any contractual breaches or impairment except for its failure to hold the election.[159] But unlike the flight attendant parties, it is not alleged that AFA and David conspired to undermine the election. There are no facts in the Counterclaim showing that David ever contributed to, responded to, or even acknowledged the plan to violate the CFAA to stop the election.[160] Although he was part of the group chat in which the plan was discussed, there are no allegations of any affirmative actions tying him to the plan.[161] Additionally, the Counterclaim alleges that Grange breached her contract with SIA,[162] but it fails to plead any facts tying David or AFA to this breach. Thus, there are no facts suggesting that David and AFA interfered with SIA's contracts at all, much less through improper means. The Counterclaim does not plausibly state a claim that David and AFA tortiously interfered with SIA's contractual relations.

---

[156] *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 32, 459 P.3d 1060, 1069 (quoting *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 45, 437 P.3d 343).
[157] MTD 25; Opp'n 23–24.
[158] *See St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201.
[159] *See* Counterclaim.
[160] *Id.* ¶¶ 44–68.
[161] *Id.* ¶¶ 56–57, 65.
[162] *Id.* ¶¶100–07.

**VI.    Civil Conspiracy**

Finally, SIA alleges that Counterclaim Defendants conspired to unlawfully "obtain SIA's

Confidential Member Information" for the purposes of replacing SIA with AFA and to

undermine SIA's election.[163] To plead a claim for civil conspiracy, a complaint must allege facts

establishing "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a

meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and

(5) damages as a proximate result thereof."[164] "It is not necessary that each member of the

conspiracy commit an unlawful act in furtherance of the conspiracy to be liable;" instead, "a

conspirator may be liable for a co-conspirator's unlawful acts in furtherance of the

conspiracy."[165] Similarly, a civil conspiracy does not require direct proof of a formal

agreement.[166] Rather, a "conspiracy may be inferred from circumstantial evidence, including the

nature of the act done, the relations of the parties, and the interests of the alleged

conspirators."[167] Counterclaim Defendants argue that SIA fails to allege facts showing a meeting

of the mind on any unlawful objective.[168]

The Counterclaim states that Counterclaim Defendants conspired to obtain SIA's

information, essentially a conspiracy to violate the CFAA by accessing the secure SIA website to

get the information.[169] SIA alleges that they sought this information for the purposes of

---

[163] *Id.* ¶ 121.
[164] *Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 70, 416 P.3d 401, 425 (quoting *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944).
[165] *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493, 497.
[166] *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 791 (Utah Ct. App. 1987).
[167] *Id.*
[168] MTD 26.
[169] Counterclaim ¶ 121.

undermining its election and replacing it with AFA.[170] The Counterclaim provides evidence of two different sets of communications that could indicate a meeting of the minds on the objective of violating the CFAA.

First, the Counterclaim describes communications between David, Crossley, and Price in April 2023.[171] These communications indicate that all three knew Price had accessed SIA's confidential website and information.[172] They discussed whether continued access would be "sketchy,"[173] and ultimately agreed that Price should continue to access the secure SIA computers to obtain information.[174] The facts plausibly indicate that David and other AFA agents, Price, and Crossley had a meeting of the minds to access SIA's information. They also plausibly plead a wrongful act in Price violating the CFAA by accessing SIA's protected computers in furtherance of this object. Therefore, the Counterclaim states a claim for conspiracy against Price, Crossley, David, and AFA for the April 2023 communications. However, there is no indication that Grange was involved in this conspiracy or participated in these communications.[175]

Second, SIA describes a series of communications between Price, Crossley, and Grange in August 2023.[176] The three discussed how Price had previously accessed SIA's information[177] and how to "expose" the flaws to undermine the election.[178] Then, on a separate group chat with

---

[170] *Id.*; *see also* Opp'n 24 n.7.
[171] Counterclaim ¶¶ 21–28.
[172] *Id.*
[173] *Id.* ¶ 25.
[174] *Id.* ¶ 26–27.
[175] *See id.* ¶¶ 21–28.
[176] *Id.* ¶¶ 35–73.
[177] *Id.* ¶¶ 35–36.
[178] *Id.* ¶¶ 39, 42.

additional flight attendants, the three further planned how to undermine the election using the information Price would obtain.[179] These messages plausibly allege a meeting of the minds between Price, Crossley, and Grange to obtain and release SIA's information to undermine the election. The Counterclaim also plausibly alleges that Price accessed SIA's computer system and violated the CFAA to obtain the information in furtherance of this object.[180] SIA thus includes facts that show a meeting of the minds regarding an objective and a wrongful act, agreed to and supported by Grange, Price, and Crossley, to further that objective. However, these communications do not plausibly allege any meeting of the minds between the aforementioned parties and David or AFA. Though David was included in the second chat and was asked a question, he never responded or participated in any discussion or planning about the SIA election.[181] Therefore, the Counterclaim states a claim for conspiracy against Price, Crossley, and Grange for the August 2023 communications.

## ORDER

The [129] Motion to Dismiss is GRANTED in part and DENIED in part. SIA's Second, Fifth, Sixth, and Eighth (with respect to David and AFA) Causes of Action are hereby dismissed.

---

[179] *Id.* ¶¶ 44–68.
[180] *Id.* ¶ 58.
[181] *Id.* ¶¶ 56–57, 65.

Signed December 9, 2025.

BY THE COURT

_____
David Barlow
United States District Judge